**SO ORDERED.**

**SIGNED this 4 day of August, 2014.**

_____
**Randy D. Doub
United States Bankruptcy Judge**

_____

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NORTH CAROLINA
GREENVILLE DIVISION

IN RE:

| | |
|---|---|
| TANGLEWOOD FARMS, INC., OF ELIZABETH CITY | CHAPTER 7<br>CASE NUMBER: 10-06719-8-RDD |
| DEBTOR | |
| JAMES B. ANGELL, TRUSTEE,<br><br>PLAINTIFF,<br><br>v.<br><br>MONTAGUE FARMS, INC.,<br><br>DEFENDANTS. | ADVERSARY PROCEEDING<br>NUMBER: 12-00202-8-RDD |

**ORDER**

Pending before the Court is the Plaintiff's Motion and Memorandum of Law in Support of Summary Judgment filed by the Chapter 7 Trustee (the "Trustee") on January 7, 2014, the Response in Opposition to Plaintiff's Motion and Memorandum of Law in Support of Summary Judgment filed by Montague Farms, Inc. ("Montague") on January 30, 2014, and the Supplemental Response in Opposition to Plaintiff's Motion and Memorandum of Law in Support of Summary Judgment

filed by Montague on July 11, 2014. The Court conducted a hearing in Greenville, North Carolina on July 21, 2014, to consider these matters.

## PROCEDURAL HISTORY

On August 20, 2012, the Trustee filed the complaint (the "Original Complaint") initiating this adversary proceeding seeking to recover two transfers from Tanglewood Farms, Inc., of Elizabeth City (the "Debtor"): (i) a 2008 transfer in the amount of $170,183.20 (the "November 2008 Payment") to Montague; and (ii) a 2009 transfer in the amount of $80,076.40 (the "November 2009 Payment") to Montague as constructively fraudulent transfers pursuant to §§ 544, 548, 550 and 551 of the Bankruptcy Code and the North Carolina Uniform Fraudulent Transfer Act, N.C. Gen. Stat. § 39–23.1 et seq. Montague filed a motion to dismiss the Original Complaint for failure to state a claim upon which relief can be granted. On April 15, 2013, after a hearing on the motion to dismiss, the Honorable J. Rich Leonard entered an order denying in part and allowing in part the motion to dismiss. Judge Leonard found that the Trustee met the pleading requirements with respect to the November 2009 Payment. With respect to the November 2008 Payment, Judge Leonard found that the allegations contained in the complaint were insufficient to plead insolvency. In his order, Judge Leonard did not address the Trustee's request for leave to amend the complaint. The Trustee renewed his request for leave to amend the complaint and on October 23, 2013, the Honorable A. Thomas Small entered an order granting the Trustee's motion for leave to amend the complaint finding that the proposed amendments were not clearly insufficient or frivolous on their face as to render the amendments futile. On October 24, 2013, the Trustee filed an amended complaint (the "Amended Complaint") against Montague. Montague filed its motion to dismiss the Amended Complaint and its answer to the Amended Complaint on November 12, 2013.

On January 7, 2014, the Trustee filed a motion for summary judgment asserting no genuine issue of material fact exists that preclude avoidance and recovery of the transfers from Montague in the amount of $250,259.60. On that same date, Montague filed a motion for summary judgment asserting no genuine issue of material fact exists that preclude judgment from being entered in its favor. On January 28, 2014, the Trustee filed a response to Montague's motion for summary judgment. On January 30, 2014, Montague filed its response to the Trustee's motion for summary judgment.

On April 2, 2014, the Court conducted a hearing to consider Montague's motion for summary judgment, Montague's motion to dismiss, and the Trustee's response thereto. On May 23, 2014, the Court entered the Order denying Montague's motion for summary judgment[1] and finding that there was a genuine issue of material fact with respect to whether the Debtor received less than a reasonably equivalent value for the transfers at issue, and as to insolvency. In addition, the Court noted that it was not clear from the evidence whether the "Seed Order Form" referenced in the contracts at issue, identified the Debtor as a responsible party to the transaction and this lack of clarity created a genuine issue of material fact. The Court conducted a hearing to consider the Trustee's pending motion for summary judgment on July 21, 2014. At the hearing, the Trustee and counsel for Montague represented that although Montague commonly utilizes "Seed Order Forms" and both contracts refer to a "Seed Order Form," this document never existed with respect to the 2008 and 2009 contracts.

---

[1] In its Order, the Court noted that in considering Montague's motion to dismiss it considered matters outside the pleadings. Accordingly, the Court considered Montague's motion to dismiss as one for summary judgment pursuant to Federal Rule of Civil Procedure 12(d).

## STATEMENT OF THE FACTS[2]

On August 20, 2010, the Debtor filed a petition for relief under chapter 11 of the Bankruptcy Code.  On July 12, 2011, the Debtor's case was converted to one under chapter 7 and the Trustee was appointed. The Debtor, a granary facility in Pasquotank County, North Carolina, was operated by its president and sole shareholder, James Howard Winslow ("Mr. Winslow"). In that capacity, Mr. Winslow oversaw the Debtor's purchase, sale and storage of corn, wheat and soybeans (collectively "grain") and facilitated grain exchange between the Debtor, Winslow Farms[3], grain suppliers, and purchasers. The Debtor purchased grain from Winslow Farms and stored grain Winslow Farms sold to third parties at its granary facility. Mr. Winslow and his wife, Billie Reid Winslow (collectively the "Winlsows"), filed a joint voluntary petition for relief under chapter 11 of the Bankruptcy Code on August 23, 2010[4].

---

[2] The court has set forth several detailed recitations of the relevant facts surrounding the debtor and its fiscally irresponsible business operations prompting its bankruptcy filing in *Angell v. Meherrin Agricultural & Chemical Co.* (*In re Tanglewood Farms, Inc. of Elizabeth City*), No. 12–00186–8–JRL, 2013 WL 1405729 (Bankr. E.D.N.C. Apr. 8, 2013), *Angell v. Endcom, Inc.* (*In re Tanglewood Farms, Inc. of Elizabeth City*), 487 B.R. 705, 2013 WL 692975 (Bankr. E.D.N.C. Feb. 26, 2013), *Angell v. Augusta Seed Corp.* (*In re Tanglewood Farms, Inc. of Elizabeth City*), No. 12–00193, 2013 WL 474704 (Bankr. E.D.N.C. Feb. 7, 2013), and *In re Tanglewood Farms, Inc. of Elizabeth City*, No. 10–06719, 2011 WL 672060 (Bankr. E.D.N.C. Feb. 18, 2011). For purposes of clarity and for the benefit of the record, the court will reiterate and supplement those facts where necessary.

[3] Winslow Farms was Mr. Winslow's personal farming operation, which supplied the debtor with grain.

[4] The relationship between the Debtor, Mr. Winslow and his personal farming operation was so intertwined and close that many, including suppliers and purchasers, identified them as one entity. Despite this tripartite relationship, this court denied the motion to consolidate the Winslows' individual case with the Debtor's case on February 18, 2011. *See Tanglewood Farms,*

The Debtor's schedules and statement of financial affairs, filed on September 3, 2010, reveal that the Debtor had total liabilities of $38,290,562.04 compared to total assets of $2,954,363.65 on the petition date. Its statement of financial affairs, however, lists gross income of $20,470,302.00 in 2008, $3,000,000.00 in 2009 and $2,410,440.82 from January to August 2010.

Montague is a specialty soybean grower, organized and existing under the laws of the State of Virginia. Montague sells high quality soybeans for use and consumption worldwide ("Proprietary Soybeans"). In order to grow Proprietary Soybeans in the amount and quality required by its customers, Montague sells proprietary soybean seeds to individuals or entities to grow. Montague then repurchases the Proprietary Soybeans from the individual or entity that purchased the proprietary soybean seeds.

Montague and the Debtor began doing business together around 1993 and since that time have annually entered into production contracts. In 2008 and 2009, Montague entered into two such written production contracts with Mr. Winslow to grow proprietary soybean seeds and then sell the Proprietary Soybeans back to Montague. Montague drafted both contracts. Both contracts refer to Mr. Winslow as the "Grower." The 2008 contract was signed by Mr. Winslow and Montague's vice president, O. Bryan Taliaferro, on behalf of "MF." The 2008 contract sets forth Mr. Winslow's obligation to purchase the proprietary soybean seeds and states "[s]eed is to be purchased after the date of this Agreement from [Montague] or its authorized Dealer. Terms of purchase shall be specified on 'Seed Order Form.' Seed purchased from Dealer to be picked up at Dealer's warehouse". The 2009 contract was signed by Mr. Winslow and John Thomson on behalf of "Montague Farms, Inc." The 2009 contract provides "[s]eed is to be purchased after the date of this

---

2011 WL 672060, at *1–2 (Bankr. E.D.N.C. Feb. 18, 2011).

5

contract given below from MFI. Terms of purchase shall be as described on the 'Seed Order Form.' MFI agrees to deliver such seed at a time and to location reasonably specified by Grower." Both contracts provide that "Grower agrees to plant all seed obtained under this contract and to prevent transfer of such soybeans or seed to another party without consent of Montague." Although both contracts refer to "Seed Order Form", this document never existed with respect to the 2008 and 2009 contracts. In addition, the contracts provide that Montague will pay a base payment per bushel of the Proprietary Soybeans based on the current market price, as well as a premium payment per bushel in excess of the market price for qualifying bushels of the Proprietary Soybeans. It is Montague's practice to pay such premium to compensate the grower because: (1) the yield of Proprietary Soybeans is lower per acre than regular soybeans; (2) producing Proprietary Soybeans requires additional work; and (3) to create an incentive for production of Proprietary Soybeans.

Between 2008 and 2009, Mr. Winslow grew the proprietary soybean seeds received from Montague and then sold the Proprietary Soybeans to the Debtor. The Debtor then sold the Proprietary Soybeans to Montague. Montague purchased approximately $5,098,606.04 worth of Proprietary Soybeans from the Debtor between 2008 and 2009. Pursuant to the contracts, Montague allowed payment for the cost of the proprietary soybean seed that was purchased out of the payment for the first shipment of Proprietary Soybeans to Montague Farms. Montague remitted payments to the Debtor totaling $2,872,123.36 between October 2008 and June 2009 for grain it purchased in 2008. Among these was a payment of $401,238.39, by check dated November 10, 2008 and drawn on Montague's account. This payment, however, was reduced by $170,183.20 representing the amount owed to Montague for the proprietary soybean seed it sold on account to Mr. Winslow and Winslow Farms. The Debtor received, as a result, $231,055.19 of the November 2008 Payment.

6

Similarly, Montague made payments of $2,199,831.45 between November 2009 and April 2010 for grain purchased from the Debtor during 2009. On November 24, 2009, Montague made a payment of $745,315.69, which was reduced by $80,076.40 to offset proprietary soybean seed previously purchased by Mr. Winslow from Montague and used by Winslow Farms. Both payments were made by Montague within the two–year period preceding the petition date. After withholding portions of both the payments to offset the outstanding accounts payable for seed purchased and used by Winslow Farms, the Debtor only received $231,055.19 of the November 2008 Payment and $665,239.29 of the November 2009 Payment. Montague paid the Debtor in full, in cash or proprietary soybean seed, for all sales of Proprietary Soybeans to Montague in farming years 2008 and 2009. At no point in time did Montague remit any payment to Mr. Winslow. While the contracts and Montague's Grain Accounts Statement show Mr. Winslow to be the account holder, the delivery tickets and the invoices from Montague dated August 8, 2008 and July 28, 2009, show the customer as "Tanglewood."

## DISCUSSION

"[S]ummary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (internal quotations omitted). In making this determination, conflicts are resolved by viewing all facts and all reasonable inferences in the light most favorable to the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). "Only disputes between the parties over facts that might affect the outcome of the case properly preclude the entry of summary judgment." *Nationwide Mut. Ins. Co. v. McMahon*, 365 F. Supp. 2d 671, 674

7

(M.D.N.C. 2005) (citing *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 247-48 (1986)). Accordingly, the court must examine "both the materiality and the genuineness of the alleged fact issues" in ruling on this motion. *Id.* (citing *Faircloth v. United States*, 837 F. Supp. 123, 125 (E.D.N.C. 1993)).

The Fourth Circuit has recognized the affirmative obligation of the "trial judge to prevent 'factually unsupported claims and defenses' from proceeding to trial." *Felty v. Graves-Humphreys Co.,* 818 F.2d 1126, 1128 (4th Cir. 1987) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S. Ct. 2548, 2553, 91 L.Ed. 2d 265 (1986)). "[T]here is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party . . . If the evidence is merely colorable . . . or is not significantly probative, summary judgment may be granted." *Glover v. Lockheed Corp.*, 772 F. Supp. 898, 904 (D. S.C. 1991) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)).

Section 548 of title 11 permits the trustee to avoid as fraudulent, any transfer of a debtor's interest in property within two years of the petition date, provided the debtor "received less than reasonably equivalent value in exchange for such transfer" and either:

> (I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;
> (II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital;
> (III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured; or
> (IV) made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.

11 U.S.C. § 548(a)(1); *Angell v. Haveri* (*In re Caremerica, Inc*.), 409 B.R. 346, 352 (Bankr. E.D.N.C. 2009) ("[A] transfer is avoidable if it was either actually fraudulent in that it '(i) had at its

purpose an intent to hinder, delay or defraud the debtor's creditors,' or that it was constructively fraudulent in that it '(ii) was made while the debtor was in a precarious financial condition, and the transaction did not provide the debtor with a reasonably equivalent value in exchange for the item transferred.'" (quoting 5 Collier on Bankruptcy ¶ 548.01 (Alan N. Resnick & Henry J. Sommer, eds., 15th ed. rev.)).

The Trustee must prove by a preponderance of the evidence, that the Debtor did not receive reasonably equivalent value in exchange for the challenged transfer and the Debtor was insolvent on the dates of the transfers at issue. *Angell v. Endcom* (*In re Tanglewood Farms, Inc.*), 487 B.R. 705, 709 (Bankr. E.D.N.C. 2013) (citing 11 U.S.C. § 548(a)(1)(B)).

The Bankruptcy Code defines "insolvency" as the "financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation" . . . 11 U.S.C. § 101(32)(A). Courts in the Fourth Circuit apply the "balance sheet test" when assessing a debtor's insolvency. *Angell v. Meherrin Agricultural & Chemical Company & CNH Capital America LLC* (*In re Tanglewood Farms, Inc., of Elizabeth City*) 2013 WL 1405729, at *5 (Bankr. E.D.N.C. Apr. 8, 2013). The "balance sheet test" requires a determination of whether the debtor was insolvent on the date of the transfer, which involves comparing of the fair value of the debtor's assets at the time of the transfer with the liabilities on the same date. *Id.* (citing *Ruby v. Ryan* (*In re Ryan*), 472 B.R. 714, 727 (Bankr.E.D.Va. 2012)).

This Court in associated adversary proceedings commenced in this Debtor's case, has utilized the Debtor's egregious insolvency as of the petition date to determine the plausibility of whether the debtor was insolvent on the dates of earlier transfers. *Meherrin Agric. & Chem*, 2013 WL 1405729, at *6-7; *Augusta Seed*, 2013 WL 474704, at *3 (citation omitted)); *Angell v. First*

*Eastern, LLC* (*In re Caremerica, Inc.*), 08-00157, 2011 WL 1457223, at *3 (Bankr. E.D.N.C. Apr. 15, 20110; *cf. Oliver v. Cooper* (*In re Bateman*), No. 11-00387, 2012 WL 1110080, at *2-3 (Bankr. E.D.N.C. Apr. 2, 2012) (hereinafter "*CooperI*"; *Oliver v. Cooper* (*In re Bateman*), No. 11-00387, 2012 WL 3061181, at *3(Bankr. E.D.N.C. July 26, 2012) (hereinafter "*CooperII"*). In this Court's prior order denying Montague's motion to dismiss, the Court found that the egregious nature of the Debtor's insolvency on the petition date was insufficient to plausibly demonstrate its insolvency with respect to transfers made prior to 2009. *Angell v. Montague Farms, Inc.*, 2013 WL 1619390, at *5 (Bankr. E.D.N.C. Apr. 15, 2013) (citations omitted).

The Trustee contends that the Debtor was insolvent on the date of both the November 2008 Payment and the November 2009 Payment. Montague responds that the Trustee has failed to submit any evidence that the Court can properly consider as to the required insolvency element for either the November 2008 Payment or the November 2009 Payment. Because insolvency is measured at the time the transfer occurred, the Trustee must show the Debtor was insolvent on November 10, 2008 and November 24, 2009. The Trustee offers affidavits and various documents to demonstrate the Debtor's insolvency on the dates in question. Montague objects to the documents based on foundation grounds, lack of authentication, and hearsay. Specifically, the Trustee relies on the affidavit of Jennifer L. McInnes (the "McInnes Affidavit") and attached documents entitled Tanglewood Farms, Inc. Balance Sheet as of November 10, 2008 (the "November 2008 Balance Sheet") and Tanglewood Farms, Inc. Balance Sheet as of November 30, 2009 (the "November 2009 Balance Sheet") to demonstrate the Debtor's insolvency as of November 10, 2008 and November 24, 2009. Jennifer L. McInnes, is a paralegal at the Trustee's law firm who is not associated with the Debtor. The McInnes Affidavit states the documents were turned over to the Trustee by Adams,

10

Martin & Associates, P.A., the Examiner for the Debtor ("Adams & Martin").  The affidavit does not provide any information as to the accuracy of the documents and does not provide any information as whether the assets were valued at a fair valuation. According to the November 10, 2008 Balance Sheet, the value of the assets owned by the Debtor as of November 10, 2008 was $10,531,590.89, while the amount of the Debtor's liabilities was $10,229,911.87. The Trustee acknowledges that the face of the November 10, 2008 Balance Sheet shows the Debtor's assets exceed its liabilities, but notes that the balance sheet does not include liabilities the Debtor owed to Meherrin Agricultural & Chemical Company or CNH Capital America, LLC, the Debtor's two largest creditors. According to the November 30, 2009 Balance Sheet, the value of the assets owned by the Debtor as of November 30, 2009 was $9,788,168.72, while the amount of the Debtor's liabilities was $12,459,073.34. The Court finds that the Trustee has failed to lay a proper foundation for the consideration of the purported balance sheets.  Ms. McInnes is a paralegal with the Trustee's law firm and has no relationship or inside knowledge concerning the Debtor's operations.  Further, the Court questions the reliability of such balance sheets as they do not accurately account for all of the Debtor's liabilities and do not take into account the value of the Debtor's soybeans or the value of grain, raising genuine issues of material fact as to insolvency.

In addition, the Trustee offers the affidavit of Jeff Vinson (the "Vinson Affidavit"), the "Director of Financial Services" of Meherrin Agricultural & Chemical Company, which alleges balances owed on joint obligations of Mr. Winslow and the Debtor as of November 10, 2008 and November 29, 2009. The accounts attached to the affidavit, however, are solely in the name of James H. Winslow and Billie R. Winslow and do not show any "joint" obligations. The Court cannot ascertain from the face of the Vinson Affidavit or the account statements any explanation as to how

11

the Debtor had any obligation to Meherrin Agricultural & Chemical Company. Additionally, the Trustee James B. Angell personally submitted an affidavit in response to Montague's concerns regarding authenticity of documents which demonstrate the Debtor's liabilities to CNH Capital America, LLC. The affidavit states that in connection with its obligation under this Court's Rule 2004 Order entered on April 3, 2012, CNH Capital America, LLC produced statements of accounts by electronic email to the Trustee. Similar to the McInnes Affidavit, the affidavit of James B. Angell fails to lay a proper foundation for the Court to consider the attachments. Lastly, the Trustee submitted the affidavit of Sarah J. Armstrong, the Senior Manager of Financial Statement Services with Adams & Martin. The affidavit states that Adams & Martin was appointed to serve as Examiner in the Debtor's bankruptcy case and in Mr. Winslow's individual bankruptcy case. Ms. Armstrong avers that the Debtor provided Adams & Martin with Quickbook files and records dating back to 2000 and continuing through August 2010. She avers that she has reviewed the documents and that the liabilities of CNH Capital and Meherrin Agricultural & Chemical Company were booked in Quickbooks under Mr. Winslow's name, and that no liabilities of CNH Capital or Meherrin Agricultural & Chemical Company appear on the balance sheets of the Debtor. Even if the Court were to consider the Quickbook documents, the documents show that the Debtor was solvent on October 31, 2008 and November 30, 2008. In addition, the Quickbook balance sheets fail to account for any soybean inventory. It is also not clear from the Quickbook balance sheets how the assets were valued on such dates and the affidavit fails to discuss such assets. In addition, Ms. Armstrong is not affiliated with the Debtor. The Court is unable to ascertain an accurate picture of the Debtor's assets and liabilities as of the dates in questions upon a review of the Trustee's affidavits and documents. The Trustee can avoid these foundation and authentication issues by having a qualified

individual associated with the above mentioned entities properly lay the foundation for the Court's consideration of such documents pursuant to Federal Rule of Evidence 803(6).

Additionally, the Trustee provides excerpts of the deposition testimony of two farmers, Kenneth Bateman of Kenneth Bateman Farms, LLC, and Richard Jackson to demonstrate the Debtor's insolvency. Mr. Bateman testified that he noticed a problem with the Debtor paying him on time in the 2008 and 2009 time frame. Mr. Jackson testified, that in 2008 Mr. Winslow represented to him that he had to borrow money to pay debt owed to him on one occasion and that he frequently questioned when Mr. Winslow was going to pay him. While the excerpts do show the Debtor slowed down in making its payments to these two creditors, they do not show the reasons behind such slow down. Accordingly, the Court finds the deposition excerpts fail to show the absence of a genuine issue of material fact as to insolvency.

As for reasonably equivalent value, "[t]he focus is on the consideration received by the debtor, not on the value given by the transferee. The purpose of fraudulent transfer law is the preservation of the debtor's estate for the benefit of its unsecured creditors." *Harman v. First Am. Bank of Md.* (*In re Jeffery Bigelow Design Grp., Inc.*), 956 F.2d 479 (4th Cir. 1992). "A large or significant disparity between what the debtor gave and what it received in exchange typically precludes a finding that the debtor received reasonably equivalent value." *Angell v. Endcom, Inc.* (*In re Tanglewood Farms, Inc. of Elizabeth City*) 487 B.R. 705, 710 (Bankr. E.D.N.C. Feb. 26, 2013) (citing 5 Collier on Bankruptcy ¶ 548.05[2][a],[b] (Alan N. Resnick & Henry J. Sommer eds., 16th ed. rev. 2012) ("Courts generally find a lack of reasonably equivalent value when the transfer or obligations benefits a third party . . . . hold[ing] that such transfers provide no value to the debtor.").

Montague cites to this Court's recent decision in the associated adversary proceeding of *Angell v. Craft Air Services, LLC (In re Tanglewood)* AP No. 12-00191-8-RDD (Bankr. E.D.N.C. May 28, 2014) for the proposition that the Debtor's acceptance of the payments in connection with the contracts in the absence of an objection by the Debtor or Mr. Winslow created an obligation of the Debtor to Montague for the exact amount that was satisfied pursuant to the delivery of the proprietary soybean seeds. In *Craft Air Services, LLC*, the Court addressed the issue of whether the payment for the services rendered by Craft Air Services, LLC ("Craft Air") was the sole responsibility of Mr. Winslow, or whether Mr. Winslow and the Debtor were jointly liable. *Id.* at 4-5. Craft Air sent twenty nine billing statements addressed jointly to "Tanglewood Farms" and "Jimmy Winslow" and neither Mr. Winslow or the Debtor objected to the address on the statements. *Id.* The Court found that under North Carolina law, the twenty nine statements, sent to Mr. Winslow and the Debtor constituted an account stated making both Mr. Winslow and the Debtor liable on the Craft Air accounts. *Id.* at 6. The Court noted that Mr. Winslow approved of the account statements being sent to both himself and the Debtor. Further, at the trial Mr. Winslow testified that "I am Tanglewood Farms" and that "the corporation and him were all one in the same." *Id.* at 3. The Court found that both Mr. Winslow and the Debtor were jointly liable. *Id.* at 7. Accordingly, the Debtor did receive reasonably equivalent value for services delivered by Craft Air. *Id.* at 7.

In the present case, there are only two invoices between the parties. The two invoices were sent from Montague and addressed to "Tanglewood 1268 US 17 South, Elizabeth City, NC 27909." While the invoices were addressed to "Tanglewood," the only written agreements between the parties are the contracts between Montague and Mr. Winslow, in his individual capacity. The Debtor's name does not appear anywhere on the contracts. Montague's own Grain Accounts

14

Statement show the account holder as "Winslow, Jimmie D. 1268 US 17 South, Elizabeth City, NC 27909." Montague gives much weight to the fact that all of Montague's proprietary soybean seed shipments were delivered to the Debtor's address and not Mr. Winslow's address. The Court does not find this fact to be persuasive, however, because Mr. Winslow testified at his deposition that everything that was purchased for his personal farming operation was delivered to the Debtor as he conducted his own personal business out of an office related to the Debtor and never had these items delivered to his personal residence. Winslow Dep. 67:5-21, Dec. 2, 2013. Here the Court does not find it appropriate to enter summary judgment in favor of Montague on the basis that there was an account stated between the Debtor and Montague. The contracts at issue do not reference the Debtor as a party to the transaction and there are only two invoices existing between the Debtor and Montague unlike the circumstances as set forth in *Angell v. Craft Air Services, LLC* (*In re Tanglewood*) AP No. 12-00191-8-RDD (Bankr. E.D.N.C. May 28, 2014) .

The Trustee contends the Debtor did not receive reasonably equivalent value in exchange for the November 2008 Payment and the November 2009 Payment because the Debtor paid for an obligation belonging to Mr. Winslow. To support this argument, the Trustee contends that although Mr. Winslow was obligated to Montague under the 2008 and 2009 contracts, Mr. Winslow failed to make any payments to Montague for the proprietary soybean seed, nor did Montague attempt to collect any money from Mr. Winslow. Instead, the Trustee asserts that Montague charged the Debtor for the proprietary soybean seed when it withheld the transfers from the Debtor's grain proceeds. The Trustee also notes that the Debtor paid Mr. Winslow for the Proprietary Soybeans when Mr. Winslow transferred the Proprietary Soybeans to the Debtor and thereby paid twice for the Proprietary Soybeans.

In response, Montague contends the Trustee is unable to prove the "less than reasonably equivalent value" element of a claim under 11 U.S.C. § 548(a)(1). Montague asserts the proprietary soybean seeds were not delivered to or for the benefit of an entity other than the Debtor, nor in satisfaction of Mr. Winslow's obligation. Montague relies on the affidavit of Mr. Taliaferro which avers that at all times, it was Montague's understanding that Mr. Winslow was signing the contracts on behalf of the Debtor and that the Debtor was the purchaser of the proprietary soybean seed and the seller of the Proprietary Soybeans. Montague contends the Debtor received more than reasonably equivalent value as the Debtor received a premium in connection with the Proprietary Soybean sales in both years. Montague contends in year 2008, the Debtor received a total premium in the amount of $608,867.89. In farming year 2009, the Debtor received a total premium in the amount of $418,178.78. Although, it appears the Debtor was still short $250,259.20 from what the Debtor should have received, Montague argues that even if the Court assumes the Trustee is correct in that Mr. Winslow was obligated on the contracts to Montague, then the Debtor actually received a "windfall" because the Debtor would have received payment for Proprietary Soybeans when such payments by contract should have been given to Mr. Winslow, individually. Further, the Debtor was paid a premium for the soybeans, which it would not have received as it would have belonged to Mr. Winslow pursuant to the contract as the grower of the Proprietary Soybeans deserving of the premium payments. While Montague acknowledges the Trustee faces his biggest hurdle in connection with proving the "less than reasonably equivalent value" element, Montague does not concede the Trustee can prove the other elements.

Based on the record, the Court is unable to ascertain whether the Debtor received reasonably equivalent value for the transfers at issue. Although it would appear the Debtor received a benefit

from the payment by Montague for the Proprietary Soybeans, Mr. Winslow testified at his deposition that the Debtor was responsible for paying the cost of shipping the proprietary soybean seeds to Montague and was also responsible for processing the Proprietary Soybeans at its granary, which based on the contracts were Mr. Winslow's obligations. Winslow Dep. 53:1-25, Dec. 2, 2013.

In addition, Mr. Winslow's deposition testimony contains inconsistencies regarding whether he signed the contracts on behalf of the Debtor or individually. For example, when questioned by counsel for Montague regarding Mr. Winslow's signature on the contracts he testified as follows:

> Q. And did you sign this document on behalf of Tanglewood Farms, Inc.?
> A. Yes, sir.
> Q. Because, in essence – and that's consistent with your testimony that the transactions were between Montague Farms and Tanglewood Farms; is that correct?
> A. That's right.

Winslow Dep. 32:25 - 33:1-6, Dec. 2, 2013.

Upon questioning by counsel for the Trustee regarding his signature on the contracts Mr. Winslow testified as follows:

> Q. Now, who was purchasing the seed?
> A. I purchased the seed from Bill Taliaferro. I purchased the seed from Bill Taliaferro.
> Q. All right. Now, I understand you're not a lawyer, Mr. Winslow, but based on this contract if someone was to come up to you and ask you who was responsible for purchasing the seed from Montague Farms, who would you say is responsible?
> A. I was responsible.
> Q. Jimmie Winslow was responsible?
> A. Yea. Well, yea, I bought them, but I bought them for – delivered them to Tanglewood and sold them to Tanglewood.
> Q. Okay, so, is it true that you bought the seed from Montague Farms?
> A. No –
>   MR. SINK:  Objection.
> A. – Tanglewood bought them from Montague Farms. I just signed the contract.
> Q. Oh, that's right, because –

> A. I just signed the contract. I just signed the contract. I represented Tanglewood. But, you know, Tanglewood's 99.9 percent of my business. Everything's done in Tanglewood.
> Q. So, Mr. Winslow, I'm a little bit confused, because you were saying earlier that Jimmy Winslow sold the beans to Tanglewood; is that right?
> A. That's right.
> Q. Now, how could Jimmie Winslow sell the beans to Tanglewood if Tanglewood was the one that bought the seed?
> A. Well, Tanglewood did buy the seed. They bought the seed. I just was an agent for Tanglewood.

Winslow Dep. 60:5-25 - 61:1-10.

Mr. Winslow executed two affidavits. He executed one affidavit on November 5, 2013 and a second affidavit on November 21, 2013 for the purpose of clarifying the November 5, 2013 affidavit. When questioned by the Trustee at the same deposition referenced above regarding the November 5, 2013 affidavit, he testified as follows:

> Q. [The affidavit states] "In 2008, I personally entered into a contract . . . with Montague Farms for the production of . . . 591 soybeans,"
> A. That's right.
> Q. All right. Now, it says, "I personally entered into a contract."
> A. That's right.
> Q. Jimmy Winslow personally?
> A. That's right.
> Q. Do you agree with that?
> A. That's right, but I didn't pay for the beans, Tanglewood paid for them.

Winslow Dep. 93:21-25 - 94:1-8.

When questioned by counsel for Montague regarding the second affidavit executed on November 21, 2013, Mr. Winslow answered as follows:

> Q. Do you see – is that your signature?
> A. That's right.
> Q. And you signed it both on behalf of Tanglewood Farms of Elizabeth City, Inc. and individually; is that correct?
> A. That's right.

18

>   Q. And what's the date that this [affidavit] was executed?
>   A. November the 21st

Winslow Dep. 83:23-25 - 84:1-4.

Based on questions as to what benefit if any the Debtor received from the payment by Montague for the Proprietary Soybeans and the inconsistencies within Mr. Winslow's deposition testimony, the Court is unable to determine at this point if the Debtor received a reasonably equivalent value for the transfers at issue. Based on this, and other factors, the Court finds a genuine issue of material fact exists as to whether the debtor received reasonably equivalent value for the transfers at issue.

## **CONCLUSION**

Based on the evidence, the Court finds there is a genuine issue of material fact with respect to whether the Debtor received less than a reasonably equivalent value for the transfers at issue, and as to whether the Debtor was insolvent as of the dates of the transfers. Accordingly, the Trustee's

motion for summary judgment is **DENIED**[5]. The Court directs the Clerk to set this adversary proceeding for trial.

**SO ORDERED.**

**END OF DOCUMENT**

---

[5]In addition, the Trustee requested that the Court enter summary judgment in his favor for avoidance and recovery of the November 2008 Payment and the November 2009 Payment pursuant to the North Carolina Uniform Fraudulent Transfer Act. Section 544 of the Bankruptcy Code allows a claim for avoidance of fraudulent transfers to also be brought under North Carolina's Uniform Fraudulent Transfer Act. Because the November 2008 Payment and the November 2009 Payment occurred within the two year period prece eding the petition date, the analysis regarding a claim brought under Section 544 or 548 remains much the same. *Angell v. Augusta Seed Corp.* (*In re Tanglewood Farms, Inc., of Elizabeth City*), AP No. 12-00192-8-JRL, 2013 WL 474704 at* 2 (Bankr. E.D.N.C. Feb. 7 2013) (noting that a cause of action under North Carolina's Uniform Fraudulent Transfer Act may be brought within four years of the alleged fraudulent transfer. N.C. Gen. Stat. § 39-23.9), *Allman v. Wappler* (*In re Cansorb Indus. Corp.*), AP No. 07-6072, 2009 WL 4062220, at *10 (Bankr. M.D.N.C. Nov. 20, 2009 ("Section 39-23.4 of the UFTA contains both actual and constructive fraud provisions, much like Section 548 of the Bankruptcy Code).